Walter R. Hoblitzell and Anna M. Hoblitzell v. Commissioner.
Hoblitzell v. Commissioner
Docket No. 76348.
United States Tax Court
T.C. Memo 1960-215; 1960 Tax Ct. Memo LEXIS 76; 19 T.C.M. (CCH) 1197; T.C.M. (RIA) 60215; October 10, 1960
*76 Petitioner reports income on the cash basis. His father, a principal stockholder in 2 corporations, became involved in controversies with the other stockholders, and they undertook to put him out by assisting petitioner to purchase all of his stock. One of the corporations agreed to make a loan to petitioner provided petitioner would enter into an agreement with his father by which he would covenant not to compete or interfere with the corporations for 14 years. Petitioner obtained the loan and bought all of his father's shares in 1951 for $110,000, and at the same time entered into a separate contract obligating himself to pay his father $20,000 in installments to begin 10 years later, in consideration for his father's covenant not to compete or interfere for 14 years; such payment to be forfeited by the father if he violated his covenant. Petitioner sold the shares in 1955 at a profit. His father, who died in 1958, did not breach his covenant. Under the agreement, in the event of the father's death prior to the father's receipt of $20,000 when due, petitioner is obligated to make payment to the father's grandchildren. The installment payments are not due until 1961. However, *77 prior to his father's death, petitioner made several prepayments on account of the $20,000. Held: (1) All of the shares cost petitioner $110,000. (2) The noninterference agreement was separate from the agreements covering the purchases of the shares. (3) The noninterference agreement was for the benefit of the corporations. (4) Petitioner purchased the shares in a transaction entered into for profit. (5) Petitioner's obligation to pay $20,000 to his father was contingent upon his father's not breaching his covenant. (6) Petitioner was not entitled to accrue $20,000 in 1951 as part of the cost of the shares. Harold Druse, Esq., 7-9 Watching Avenue, Plainfield, N.J., for the petitioners. Scott A. Dahlquist, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency in income tax for the taxable year 1955 in the amount of $5,031.92. The issue for decision is whether, for the purpose of computing the amount of longterm capital gain realized upon the sale in 1955 of shares of stock in two corporations, the petitioner is entitled to add to his cost basis of the stock *79 the sum of $20,000. The stock, which was sold in 1955, was purchased by petitioner from his father in 1951. Under a written instrument executed in 1951, the petitioner agreed to make periodic payments to his father during a period beginning in 1961 and ending in 1965, aggregating $20,000, in consideration for his father's covenant not to compete with and not to interfere in the businesses of the two corporations. None of such payments was made by petitioner prior to the time of the sale of the stock. Findings of Fact Petitioners are residents of Plainfield, New Jersey. They filed a joint return for the taxable year 1955 with the district director of internal revenue for the district of New Jersey. Since the issue relates to Walter R. Hoblitzell only, he is referred to hereinafter as the petitioner. The petitioner filed his return on the basis of cash receipts and disbursements and a calendar year. The petitioner is the son of Walter Z. Hoblitzell (hereinafter called Hoblitzell), who died in October 1958. Petitioner has 4 children who were born in 1943, 1944, 1946, and 1951. William C. Hoblitzell is petitioner's uncle. W. F. Howard is married to a sister of Walter Z. Hoblitzell. *80 Hoblitzell, William C. Hoblitzell, and W. F. Howard were co-partners in the conduct of a Chevrolet automobile agency and garage business in Plainfield. The partnership carried on its business in a building which was and still is owned by Motor Parking Garage Co., a New Jersey corporation which was organized in 1928. The partnership business was transferred by the partners to H.O.B. Motors, Inc., a New Jersey corporation which was organized to conduct such business in October 1949. H.O.B. Motors still carries on that business. H.O.B. Motors leased the building where the business was located from Motor Parking Garage. There were issued 1,200 shares of capital stock of Motor Parking Garage, of which Hoblitzell owned 600 shares, and Howard owned 600 shares. There were issued 1,510 shares of capital stock of H.O.B. Motors, of which 500 shares, each, were owned by Hoblitzell, Howard, and William C. Hoblitzell, and 10 shares were owned by petitioner. Petitioner paid nothing for his 10 shares. In 1950, petitioner purchased from his father 100 shares of stock of Motor Parking Garage for $6,000. On October 9, 1951, under circumstances hereinafter described, petitioner purchased from *81 his father all of his father's stock in the two corporations, namely, 500 shares of Motor Parking Garage stock, and 500 shares of H.O.B. Motors. Petitioner then owned stock in the two corporations for which he had paid at least $116,000, exclusive of the sum of $20,000, which is here in dispute, as follows: Undis-
No. of
puted
Corporation
Shares
Cost
Motor Parking Garage
600
$ 61,000
H.O.B. Motors
510
55,000
$116,000
In 1955, petitioner sold all of the above described stock of the two corporations for the total sum of $220,000. In his return, the petitioner reported such sale. He reported the transaction, without specifying either the cost basis of or the sales price for the stock of each corporation, in the manner set forth below; and he reported a total long-term capital gain in the amount of $84,000, of which 50 percent, $42,000, was stated to be the capital gain to be taken into account. The sale and the gain were reported in the following way: Gross
Property
Sales
Cost or
Sold
Price
Basis
Gain
H.O.B. Motors
Motor Parking
$220,000
$136,000
$84,000
Garage
Petitioner computed the amount of the *82 total cost basis of the stock of both corporations by adding to the undisputed cost in the sum of $116,000, the sum of $20,000. The sum of $20,000 is the total amount of payments which, under a written agreement dated October 9, 1951, petitioner agreed to pay to his father in 48 monthly installments during a 4-year period beginning on November 1, 1961, and ending on November 1, 1965, in consideration for his father's covenants not to compete for 14 years from October 9, 1951, to October 9, 1965, with the businesses of Motor Parking Garage and H.O.B. Motors, and not to interfere with the management and business of both corporations. In the aforesaid agreement, petitioner also agreed that in the event of his father's death before any of the agreed installment payments had been made, or completed, he would pay such installments to the surviving grandchildren of his father in equal shares. Prior to selling all of his stock in the two corporations in 1955, petitioner had not made, and was not required to make, any of the installment payments which were to aggregate $20,000. The circumstances under which the above agreement was entered into by petitioner and his father in 1951 are stated *83 hereinafter. The dispute between the parties relates to petitioner's obligation to pay the $20,000, which the petitioner included in, and the respondent excluded from, petitioner's cost basis of his shares of stock in the two corporations. The circumstances under which the petitioner purchased from his father in October 1951 shares of stock of the two corporations were as follows: As early as 1949, Hoblitzell's conduct as an employee of H.O.B. Motors became exceedingly objectionable to the officers and the other stockholders of that corporation, as well as to many of its customers. Hoblitzell's personal affairs and financial condition were not good, and were such as to cause him to make troublesome demands for money from H.O.B.Motors, which he, at times, freely allotted to himself. In addition, his health was bad. He had had a head injury and suffered from other disturbances. He was contentious and quarrelsome with his associates in the business of H.O.B. Motors, and his conduct in the presence of and toward potential customers was such that they were offended. Since H.O.B. Motors carried on its automobile business under an agency license from General Motors which could be terminated, *84 the officers of the corporation were fearful that Hoblitzell's conduct, if he were allowed to continue in any way in the operations of the business, would have an exceedingly detrimental effect on the business. The then officers of H.O.B. Motors were the following: William C. Hoblitzell was president; W. F. Howard was vice-president; and petitioner was secretary. Under these circumstances, the officers of H.O.B. Motors concluded that the solution of the problem would be for the petitioner to purchase all of Hoblitzell's stock in H.O.B. Motors and in Motor Parking Garage, and in October 1949, Hoblitzell gave petitioner an option to purchase such stock. However, by July 1951, the sale had not taken place and negotiations were then being carried on about the total price to be paid by petitioner. In such negotiations, Hoblitzell was represented by his attorney, Victor Carton, and both corporations and petitioner were represented by their lawyer, George F. Hetfield. By July 20, 1951, the negotiations reached a critical stage. Carton advised Hetfield that Hoblitzell's price for his stock in both corporations was $130,000 in cash or notes, $125,000 for the stock and $5,000 for accrued *85 dividends, and no less, and that Hoblitzell had given instructions to Carton to make application to a court for the appointment of a receiver of the corporations in the event Hetfield's clients were not agreeable to paying the above price under the suggested terms. The petitioner did not have sufficient capital to purchase his father's stock in both corporations. Since the officers and the other stockholders of H.O.B. Motors were anxious to oust Hoblitzell, they discussed with petitioner a proposition involving a loan to him by H.O.B. Motors of $100,000. Hoblitzell wanted $130,000 for his stock in both corporations. Petitioner was agreeable to working out arrangements for paying that amount to him. On the other hand, the officers and directors of both corporations wanted Hoblitzell to agree that he would not interfere with the businesses of the corporations, and that he would not compete with them within an area of 5 miles from Plainfield. As between the petitioner and the officers of the corporations, an understanding was reached that H.O.B. Motors would loan petitioner $100,000 on favorable terms, at 2 1/2 per cent interest, to be repaid in 20 years, by October 9, 1971, provided *86 petitioner would obtain Hoblitzell's agreement not to interfere in and not to compete with the businesses of the corporations, which agreement would contain a penalty provision for liquidated damages in the event Hoblitzell breached his covenants. Hetfield acted as the attorney in the preparation of the agreements between petitioner and Hoblitzell. H.O.B. Motors paid his fees. He drafted 3 agreements, to which the parties were Hoblitzell and petitioner, only, although in two of the agreements, there was a clause stating that Hoblitzell agreed with the corporations, as well as with the petitioner, that he would not interfere with the corporations' businesses. The sale of the stock in each corporation by Hoblitzell was covered by an individual agreement. Hoblitzell's covenants not to compete and not to interfere were set forth in a third agreement which contained a liquidated damages clause. The three agreements were to be executed simultaneously. No single agreement would have been executed without the execution of the two other agreements. There were further negotiations with Hoblitzell between July 20 and October 9, 1951. It was finally agreed that the whole transaction would *87 be carried out in the following way: H.O.B. Motors would loan petitioner $100,000. Hoblitzell would receive, upon the execution of the agreements, $110,000 in exchange for his shares of stock in both corporations; and he would receive an additional $20,000 by November 1, 1965, payable in monthly installments to begin 10 years later, on November 1, 1961, provided he did not violate his covenants not to compete and not to interfere. Although the corporations were to be the beneficiaries of Hoblitzell's covenants, petitioner was to make the payments aggregating $20,000. The officers of H.O.B. Motors specified that as a condition of the loan of $100,000 to petitioner, he would have to enter into the third agreement with his father, the noninterference agreement. That agreement, with the provision that Hoblitzell would forfeit $20,000 as liquidated damages if he violated his covenants, postponed the payment of $20,000 so as to compel Hoblitzell to abide by his covenants. H.O.B. Motors would not have loaned petitioner $100,000 if he had not entered into the noninterference agreement with his father. H.O.B. Motors loaned petitioner $100,000, to be repaid during 20 years at $5,000 per year *88 beginning October 9, 1952. Petitioner gave Motors his nonnegotiable note, bearing 2 1/2 per cent interest, for $100,000. The three agreements, dated October 9, 1951, were executed simultaneously on that date. The Motor Parking Garage stock sales contract provided in pertinent part that Hoblitzell would sell his 500 shares of that stock to petitioner for $55,000, in cash. The H.O.B. Motors stock sales contract provided that he would sell his 500 shares of the H.O.B. Motors stock to petitioner for $55,000, in cash. Under these contracts, the total sum paid by petitioner was $110,000. Each contract contained similar terms relating to mutual releases of the parties to each other, and of Hoblitzell to each corporation. The contract dealing with Motor Parking Garage stock contained the following clause: That the Seller, as a further consideration, expressly agrees with the Buyer and with Motor Parking Garage Co. that he will in no manner whatsoever interfere directly or indirectly with the management, business, officers or directors of Motor Parking Garage Co. and will completely divorce himself from any interest in the company. The contract dealing with H.O.B. Motors stock contained *89 an identical clause which referred, however, to the H.O.B. Motors, Inc. The noninterference contract between petitioner, the first party, and Hoblitzell, the second party, except for immaterial, formal clauses, provided as follows: WHEREAS, the First Party has purchased the Second Party's stock interest in Motor Parking Garage Co. and H.O.B. Motors, Inc. for a valuable consideration; and WHEREAS, it is the desire of the First Party that the Second Party not compete in any way or manner, directly or indirectly, for the next following fourteen (14) years, with Motor Parking Garage Co. or H.O.B. Motors, Inc., and further, that the Second Party in no way interfere with the operations of said companies, directly or indirectly, and is willing to pay a valuable consideration therefor, which is agreeable to the Second Party. NOW, THEREFORE, in consideration of the above premises, and One Dollar ($1.00) and other good and valuable consideration, it is mutually agreed as follows: 1. The First Party covenants that, for the consideration set forth in the next following paragraph, he will pay to the Second Party the sum of Twenty Thousand Dollars ($20,000), as herein provided, upon the *90 following terms and conditions: a. The payment of Twenty Thousand Dollars ($20,000) shall be in forty-eight (48) consecutive, monthly installments, each in the amount of Four Hundred Sixteen and 66/100 Dollars ($416.66), except that the last installment which shall be in the amount of Four Hundred Sixteen and 98/100 Dollars ($416.98). The first installment payment shall become due on November 1st, 1961. b. The Second Party shall not pledge, assign, transfer, sell, or in any manner whatsoever, accelerate, anticipate or encumber these payments. Should the Second Party do so, or in the event of bankruptcy, the First Party shall hold said sum, or unexpended balance thereof, as a trust fund and apply same for the Second Party's support or maintenance. c. In the event the Second Party should breach any of the covenants as set forth in paragraph "2", then and in that event he shall forfeit said Twenty Thousand Dollars ($20,000) as liquidated damages to the First Party. d. Said Twenty Thousand Dollars ($20,000) shall bear no interest whatsoever at any time. e. Should the Second Party die before any of the aforesaid installment payments are made, or have been completed, said sum shall *91 be paid in the same installments as aforesaid to the grandchildren of the Second Party who may survive him, absolutely, in equal shares, or said sums of money may be set up in separate trusts for each grandchild, providing the terms of said trusts are agreeable to the said grandchild's parents. 2. The Second Party, in consideration of the premises of the First Party as contained in the next preceding paragraph "1", covenants that he shall and will become bound in the penal sum of Twenty Thousand Dollars ($20,000) as liquidated damages that he, the said Second Party, shall not and will not at any time thereafter, for the next succeeding fourteen (14) years, directly or indirectly, engage in the automobile, automobile repair or garage business within five (5) miles from No. 136 East Fifth Street, Plainfield, New Jersey, which is the principal place of business of Motor Parking Garage Co. and H.O.B. Motors, Inc.; that the Second Party will in no manner whatsoever interfere, directly or indirectly, with the management, business, officers, directors or employees of either Motor Parking Garage Co. or H.O.B. Motors, Inc.; that he will not make his presence on the premises of said companies *92 objectionable to the management of said businesses; that he will not represent to any third parties that he is in any way connected with Motor Parking Garage Co. or H.O.B. Motors, Inc. in any capacity; and that he will remove himself from the premises of either Motor Parking Garage Co. or H.O.B. Motors, Inc. immediately upon request of any officer of either of said companies. In paragraph 1(e) of the above contract, the reference to the grandchildren of Hoblitzell applies to petitioner's 4 children, and 2 children of petitioner's sister. All of them were living at the time of Hoblitzell's death, and at that time all of petitioner's children were minors, and the respective ages of his sister's children were 18 or 19, and 14. Hoblitzell established an irrevocable trust for a term of 10 years. The trust was created soon after October 9, 1951. He transferred to the trust $80,000. The trust principal and income was to be applied to the support of Hoblitzell and his wife. At some time prior to July 26, 1955, General Motors cancelled the dealership agency contract of H.O.B. Motors. As of the above date all of the stock of Motor Parking Garage was owned by petitioner, W. F. Howard, and *93 W. F. Howard, Jr.; and the stock of H.O.B. Motors was owned by William C. Hoblitzell, petitioner, William C. Hoblitzell, Jr., W. F. Howard, and W. F. Howard, Jr. Prior to the above date, petitioner had instituted a law suit in the Superior Court of New Jersey against H.O.B. Motors. Also, as of the above date, petitioner owed that corporation $80,000 on his note of October 9, 1951. On July 26, 1955, petitioner entered into an agreement to sell all of his stock in both corporations. A condition of the agreement was that by September 1, 1955, General Motors would have restored the dealership franchise to H.O.B. Motors, or granted a new one to it, or to a new corporation. General Motors restored such franchise and the agreement was consummated on September 1, 1955. In the agreement, petitioner agreed to execute a covenant not to compete with H.O.B. Motors. He made a further agreement (clause 11 of the above agreement), as follows: 11. The Seller agrees that he will endeavor in good faith to prevent his father, Walter Z. Hoblitzell, from visiting the place of business of said H.O.B. Motors, Inc. and from in anywise interfering with the prosecution of its business. Under the agreement *94 of July 26, 1955, and on September 1, 1955, petitioner sold his stock, as follows: He sold 500 shares of Motor Parking Garage to W. F. Howard, Jr. for $105,000. He surrendered to Motor Parking Garage, 100 shares of its stock (to be retired) for $20,000. Petitioner sold to H.O.B. Motors, Inc., 510 shares of that corporation's stock for $95,000, of which $15,000 was paid to petitioner in cash, and $80,000 was applied in cancellation of petitioner's note of October 9, 1951. The total consideration received by petitioner was $220,000, of which amount he received $140,000 in cash. Excluding the $20,000 here in dispute, the cost of stock to petitioner, and the amounts he received in 1955 upon the sale of the shares of stock involved and the gain, were as follows: Selling
Stock
Shares
Cost
Price
Profit
Motor Parking
600
$ 61,000
$125,000
$ 64,000
H.O.B. Motors
510
55,000
95,000
40,000
$116,000
$220,000
$104,000
Petitioner's father was ill during 1955. Petitioner paid (by checks) to hospitals and physicians the total amount of $746.35, for the expenses of his father's illness. The payments were made during the period October 15 to December 11, 1955. *95 During 1957, petitioner issued 21 checks totalling $2,550, payable to his father, each of which bore the following typed notation on the reverse side: "For prepayment on agreement dated October 9, 1951." Hoblitzell endorsed each check under the notation. During 1958, the petitioner issued seven checks totalling $2,275, payable to his father; and he issued checks to others in the total sum of $1,345.85, for hospital expenses of his father. These checks totalled $3,620.85. On April 21, 1959, petitioner made his last payment on behalf of his father, a check for $5.00 payable to the Wuester Clinic, a cancer clinic. The aggregate of all the checks which the petitioner issued to his father and to others in his father's behalf during the years 1955-1959, inclusive, was $6,922.20. None of the above checks of petitioner bore any notation referring to the agreement dated October 9, 1951, except the checks issued in 1957 aggregating $2,550. With respect to the checks issued by petitioner in 1955 and 1958, to or in behalf of his father, his father did not give him any receipt or other written document indicating that any payments represented by petitioner's checks were advance payments *96 under the noninterference agreement of October 9, 1951, but there was an oral agreement with petitioner that all of his payments would be credited to the $20,000 to be paid under the noninterference agreement. Petitioner has not made any payments to or on behalf of any of the grandchildren of Hoblitzell, and his sister has not made any demand upon him to make any payments to or on behalf of her children. None are due until November 1, 1961. At the time of the trial of this case there were assessed and unpaid Federal income tax, penalty, and interest deficiencies for the taxable year 1948 against Walter Z. and Tecla Hoblitzell in the amount of $13,881.69; and, also, there were assessments outstanding against Walter Z. and Tecla Hoblitzell for the taxable year 1949 of deficiencies in tax, penalty, and interest in the amounts of $15,072.24, $5,802.81 and $8,440.45, respectively, a total of $29,315.50. No payments have been made against these assessments. The Commissioner gave the following explanation for his determination in the statement attached to his deficiency notice: It has been further determined that the contract relating to a covenant not to compete entered into on October 9, 1951 for *97 a period of 14 years from Walter Z. Hoblitzell for which you were to pay $20,000.00 in forty eight consecutive installments commencing November 1, 1961 is not allowed as an addition to the cost basis of stock sold in the taxable year since no payments have been made on this contract and the stock purchased in connection with this agreement was sold by you in the current year. The reduction in the cost basis of the stock reported in Schedule D of your return increases the capital gain to be taken into account in the amount of $10,000.00, computed as follows: Sales Price
$220,000.00
Cost as adjusted
116,000.00
Corrected gain
$104,000.00
Gain reported on return
84,000.00
Increase in gain
$ 20,000.00
Increase in capital gain to be
taken into account (50% of
$20,000)
$ 10,000.00
After petitioner filed his return for 1952, on which he reported income on the cash basis, petitioner filed a claim for a tax refund in which he made claim for a deduction of 1/14th of $20,000 as amortization of that amount over 14 years. Respondent disallowed the claim. The 3 agreements dated October 9, 1951, between petitioner and his father were separate agreements. The sum of *98 $55,000 was the total purchase price for each lot of shares of stock which petitioner purchased from his father; petitioner's total cost was $110,000; the purchases of the shares were completed on or about October 9, 1951. With respect to the agreement of Hoblitzell not to compete for 14 years and not to interfere with Motor Parking Garage and H.O.B. Motors, those corporations were the beneficiaries of Hoblitzell's covenant. Also, petitioner's obligation under that agreement to pay $20,000 to Hoblitzell was a contingent one which depended upon whether Hoblitzell complied with his covenant for 14 years, or until his death. Up to the time of his death in October 1958, Hoblitzell complied with and did not violate or breach his covenant. Petitioner made prepayments to his father of part of the agreed sum of $20,000 in 1955, 1957, 1958, and 1959 in the total amount of $6,922.20, of which $746.35 was paid in 1955 after petitioner sold the shares. Petitioner's purchase from Hoblitzell in October 1951, of 500 shares of stock of Motor Parking Garage and 500 shares of stock of H.O.B. Motors constituted a transaction entered into for profit. The contingent expense of $20,000 did not *99 accrue and was not paid in 1951. The stipulated facts are found as stipulated. Opinion In his petition, the petitioner made the following allegation: The Commissioner erred in failing "to allow the cost [$20,000] of a contract relating to a covenant not to compete, which was made an additional cost of the stock purchase of October 9, 1951, notwithstanding the fact that payments on said contract are to begin November 1st, 1961." The pleadings do not raise any other issue. There is no issue raising the question whether petitioner is entitled to a deduction of $746.35 in 1955, and on brief no contention to that end is made. During the trial of this case, petitioner testified that when his father became ill in 1955 and needed funds to pay for medical and hospital expenses, he agreed orally to advance money to his father in prepayment of the $20,000, he and his father orally agreed that money advanced to his father, or on his behalf, would be credited to petitioner's obligation to pay, as prepayments on account of, $20,000, even though the first installment would not be due until November 1, 1961. Petitioner introduced his cancelled checks showing payments to or for his father *100 totalling $6,922.20 of which amount $746.35 was paid in 1955. Petitioner's position is vague and his argument on brief is not supported by any authority other than , which has no application here other than that it refers to the general rule that net income shall be computed in accordance with a method which clearly reflects income. Petitioner's position is merely that he ought to be allowed to accrue $20,000 as part of the cost of the shares of stock of the 2 corporations which he purchased in 1951 from his father, for the purpose of computing the amount of the long-term capital gain realized upon the sales of those shares in 1955, notwithstanding the fact that he reports income on the cash basis. He argues, in effect, that since the transaction in the shares in question was a casual purchase and a casual sale of personal property, he should not be held to a strict cash method of computing his income for 1955. He claims that the cost-basis of the shares sold in 1955 is $136,000, and the gain is $84,000. Of $136,000, there is no dispute about $6,000, the cost of some shares purchased before 1951, and it is admitted that the shares purchased *101 in 1951 cost at least $110,000. The dispute relates solely to the $20,000 covered by the noninterference and noncompetition agreement of October 9, 1951, with Hoblitzell. Petitioner's argument can be understood best by quoting the essential part, in which there is an obvious reference without specifically mentioning the statute, to section 44(b) of the 1939 Code, or to the corresponding section in the 1954 Code, section 453(b). Petitioner's chief argument is as follows: In a casual transaction where the proceeds of the sale are in excess of 30% of the selling price in the initial year, the Director of Internal Revenue has the right to collect the income tax on the entire transaction in the year of the sale even though the sale price has not been fully collected by the seller. The sole exception to this rule is when the right to receive the balance in the future is contingent. At issue is the direct opposite. The purchase price has not been fully paid at the time of the casual sale. However, here the obligation to pay is fixed, and should be allowed in computing basis for the sale of these stocks. Petitioner's argument cannot be accepted. It is novel, theoretical, and wholly *102 without authority. It is not founded upon any statutory provision. It must be concluded that petitioner is not entitled to a cost basis of $136,000 in computing the amount of the gain in 1955 from the sales of the shares of stocks involved. In the first place, petitioner is incorrect in contending that the total purchase price of the shares he bought from his father in 1951 was not paid in 1951, and that it was $130,000. The evidence is clear that the total purchase price for all of the shares was $110,000, all of which was paid by petitioner on or about October 9, 1951. The agreement between petitioner and his father containing the father's covenant not to compete or interfere for 14 years with the businesses of both corporations was separate from the two contracts dealing with the father's sales to petitioner of 2 lots of shares of stock. Furthermore, under the noninterference agreement, petitioner's obligation to pay his father $20,000, in installments to start 10 years later, on November 1, 1961, was a wholly contingent obligation which would not ripen if Hoblitzell violated his covenant. Only the amount of the payment petitioner might be obliged to pay was fixed and certain; *103 the liability did not become certain upon the execution of the contract in 1951. Without categorically saying so, petitioner takes the position (which is readily inferred from his argument) that with respect to the transaction involving the purchase and sale of the shares involved, (which he regards as a casual one) he should be allowed to accrue $20,000 in 1951 as part of his cost, even though he reports income on the cash basis. He argues that in order to arrive at a fair result, we may make exceptions to general rules of tax accounting. A similar argument was rejected in . If we were to assume for purposes of argument (which we do not do) that under section 41 (1939 Code), petitioner could use a hybrid method, part cash and part accrual, with respect to the purchase in 1951 and the sales in 1955 of the shares, for the purpose of computing his net income for 1955, so as clearly to reflect income, we would then have to consider whether, under the facts, petitioner properly could have accrued $20,000 in 1951 as part of the cost of the shares. Petitioner has avoided that question, doubtless because the rule relating *104 to the accrual of contingent items of expense and income is unfavorable. "It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, * * *." ; . Under the noncompetition and noninterference agreement, Hoblitzell agreed that he would forfeit the $20,000 if at any time during 14 years he breached his covenant. Until the due date of the first installment payment on account of the $20,000, November 1, 1961, petitioner's liability under the agreement was contingent and was not absolute. It remained contingent in 1951, and, as it happened, until Hoblitzell died in October 1958. . Up to the time of his death, Hoblitzell did not violate his covenant. Petitioner could not accrue in 1951, the sum of $20,000 as part of his cost of the shares under any theory or rule. Cf., ; and . It is a settled rule that a taxpayer who reports *105 income on the cash basis can take deductions only for amounts actually paid in the taxable year for which the deduction is claimed, with certain exceptions not applicable to this case. . See, also, section 43, 1939 Code; section 461, 1954 Code. The petitioner is obliged to comply with this general rule in computing the gain in question for 1955. The respondent correctly determined that petitioner's cost basis of the shares purchased in 1951 was not more than $110,000. The above holding disposes of the only issue presented by the pleadings. The question whether payments by the petitioner in later years on account of the $20,000 properly can be treated as the subsequent payment of an expense incurred in 1951 when the loan of $100,000 was obtained and, therefore, deducted as a loss in the years of making payments of such expense is not before us. The taxable year here is 1955. Furthermore, we will not consider or decide a question which is not raised by the pleadings. , affd. on other grounds, . Decision will be entered for the respondent. *106